NO. 07-01-0131-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

JULY 10, 2002

_____

IN RE THE ESTATE OF BERNETA W. BIVINS, DECEASED

_____

FROM THE COUNTY COURT AT LAW FOR RANDALL COUNTY;

NO. 13,998; HON. JAMES ANDERSON, PRESIDING

_____

Before QUINN, REAVIS, and JOHNSON, J.J.

Oliver Wilson Bivins (Oliver) appeals from a final summary judgment denying his contest to the 1991 Will of Berneta W. Bivins (1991 Will). Joseph Batson, Jr. (Batson) had filed a traditional and "no evidence" motion for summary judgment asking the trial court to reject and thereby enter summary judgment upon Oliver's claims of undue influence and the want of testamentary capacity.[1] The motion was granted, which lead to the execution of the final judgment at issue. According to Oliver, the trial court erred in granting the motion and entering summary judgment because genuine issues of material fact existed regarding the issues of undue influence and the lack of testamentary capacity. We dismiss in part and affirm in part.

---

[1]Batson previously applied for the probate of the 1991 Will and sought appointment as independent executor of Berneta's estate.

## Standard of Review

The standards of review applicable to traditional and no evidence summary judgments are well-settled and need little discussion. We cite the parties to *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex. 1985) and *Kimber v. Sideris*, 8 S.W.3d 672, 675 (Tex. App.--Amarillo 1999, no pet.) for a general explanation of same. Lastly, in considering whether the evidence created a material issue of fact, we focus on the record citations proffered by Oliver in his brief. This is so because we have no duty to *sua sponte* scour the four volume appellate record and three complete depositions contained therein for such evidence. *Guthrie v. Suiter*, 934 S.W.2d 820, 826 (Tex. App.–Houston [1 Dist.] 1996, no pet.) (noting that the contestant did not direct the trial court to the portions of the Darby Suiter deposition upon which he was relying and stating that the court should not be compelled to sift through a 500-page deposition to search for evidence supporting the contestant's contentions).

## Jurisdiction

Batson, independent executor of the 1991 Will, initially questions the standing of Oliver to attack the will. Among other things, Oliver questions the validity of the 1990 and 1991 wills executed by Berneta and seeks to enforce another which purports to leave the bulk of her estate to a particular trust. With regard to the latter, Oliver is a contingent beneficiary. Being a contingent beneficiary of the trust and because the trust will be the recipient of properties if he succeeds at bar, Oliver has a justiciable interest granting him standing to prosecute the suit. Accordingly, we overrule Batson's contention that no such standing exists.

3

### *Testamentary Capacity*

Through his original pleading attacking probate of the 1991 Will, Oliver contended that Berneta lacked testamentary capacity to execute the document. However, the issue was omitted from his "First Amended Opposition to Probate of Will and Issuance of Letters Testamentary and Application for Probate of Written Will and for Letters Testamentary," which document was filed the day before the court convened its hearing upon the motion for summary judgment. Furthermore, at the hearing and in response to opposing counsel's statement that the supposed want of testamentary capacity of Berneta was no longer an issue, counsel for Oliver stated: "I'll represent to the Court that's correct." So too did Oliver's counsel state that "we withdrew [the issue] from the most recent pleadings." This representation of Oliver's counsel to the trial judge coupled with the omission of the claim from the amended pleading was nothing short of a stipulation of abandonment. *See In re Shaw*, 966 S.W.2d 174, 177 (Tex. App.--El Paso 1998, no pet.) (holding the representation by counsel for the Department of Protective and Regulatory Services to the court that the department would not be proceeding upon the termination of Jeremiah Worsham's parental rights and that it was waiving any termination as to that individual constituted a stipulation of abandonment). Having abandoned the claim below, it cannot be asserted on appeal as basis for reversing the summary judgment.[2]

### *Undue Influence*

---

[2]Because the claim was abandoned, the trial court could only dismiss it. *Thompson v. Kirkland*, 422 S.W.2d 258, 261 (Tex. Civ. App.--Texarkana 1967, no writ).

As previously mentioned, Batson moved for summary judgment on the claim of undue influence. He contended that Oliver had no evidence to prove that 1) undue influence existed or was exerted, 2) any purported exertion of influence overpowered Berneta's mind at the time the 1991 Will was executed, or 3) Berneta would not have executed the 1991 Will but for the supposed undue influence. Oliver responded, contending that genuine questions of material fact existed as to each ground.

As this court has said in the past, before a will may be set aside as a product of undue influence, the contestant must prove 1) the existence and exertion of an influence, 2) the operation of that influence in a manner that subverts or overpowers the mind of the testator *at the time the will is executed*, and 3) the execution of a will which would not have been executed but for the influence exerted. *Estate of Davis*, 920 S.W.2d 463, 466 (Tex. App.--Amarillo 1996, writ denied). Though each element may be established by either direct or circumstantial evidence, a finding of undue influence may not be based upon circumstances which are equally consistent with the absence of, or do no more than raise a mere suspicion of, undue influence. *Id.* at 466*.*

Next, in assessing whether influence was exerted or existed, we assess the opportunities existing to exert influence, the circumstances surrounding the execution of the testamentary document, the existence of any fraudulent motive on the part of those purportedly exerting influence, and the evidence, if any, of the testator's being "habitually subjected to the control of the party accused." *Id. (citing Rothermel v. Duncan*, 369 S.W.2d at 923)*.* However, it is not enough to simply show opportunity and motive to exert influence. *Id.* Rather, there must be some proof not only that influence was present but

5

also that it was in fact exerted with respect to the execution of the testamentary document. *Id.* Moreover, one may lawfully request or attempt to persuade another to execute a favorable will, but unless those requests or attempts at persuasion are shown to be so excessive as to subvert the mind of the testator, they do not suffice to render the instrument invalid. *Id.*

Next, in assessing the second element mentioned above, the focus lies upon the testator's mental and physical capacity to resist. *Rothermel v. Duncan*, 369 S.W.2d at 923; *Estate of Davis,* 920 S.W.2d at 466-67. This obligates us to examine the state of mind of the testator and determine whether it was subverted or overpowered at the time the will was executed. *Estate of Davis*, 920 S.W.2d at 467. With this said, we turn to the matter before us.

Though Oliver cited to the record, none of the citations were to evidence illustrating that anyone ever attempted to persuade or induce Berneta to dispose of her property at her death in a particular manner. Nor did our own review of the record uncover any such evidence. Rather, we were directed to and found evidence of the familial and business relationship between Berneta, Batson, and other family members. Moreover, evidence indicated that Batson, either individually or as president of a corporation, acted as general partner of a family limited partnership in which Batson, Berneta, and Mary Miles Batson each owned a one-third interest. It also illustrated that several individuals who worked for either Batson, his corporation or the limited partnership 1) were longtime acquaintances of Batson, Berneta and the family in general, 2) provided accounting, personal assistance, and financial management services to Berneta and other family members, 3) allowed their

6

offices to be used by Berneta when she would arrive at the office building, 4) referred Berneta to attorneys or law firms which also provided legal services to the partnership or corporation, 5) were apparently told by Berneta to whom she intended to bequeath portions of her estate, 6) received and stored Berneta's 1991 Will in the business' fireproof storage cabinet along with the wills of others related to the business or partnership, 7) arranged for employees of the limited or general partnership to witness the execution of Berneta's will, and 8) attempted to implement (along with Batson) recommendations received by financial advisers or consultants regarding estate planning *viz* Berneta's property.

Concerning the purported recommendations about estate planning, they were allegedly 1) received from the accountants or consultants familiar with the financial affairs of the partnership and its members, 2) discussed among Batson and Berneta's financial manager, and 3) then proposed to Berneta. Whether she accepted or rejected them is unknown.[3] Their general content is unknown. Whether they pertained to the manner in which she was to dispose of her estate upon her death is unknown, though one

---

[3]Oliver states in his brief that "*all* of the estate planning recommendations made by the accountants and lawyers were approved by [Batson] and were implemented by Appellee's employee, Mike Floyd." (Emphasis added). However, the record reference cited in support of the statement disclosed that Batson "would review the recommendations, and through Mike [Floyd] we would try and implement those recommendations." As can be seen, Batson did not state that "all" recommendations were implemented. Nor did he refer to the quantity of recommendations which were. Nor did he say that any involved the 1991 Will or its terms. He simply mentioned that they would "try" to implement them, with the assistance of Berneta's financial manager, Mike Floyd. So too does the record fail to support Oliver's statement that the "estate planning decisions made by Appellee were in direct contravention to Decedent's irrevocable trust," *i.e.* the trust which Oliver purports to enforce herein. Simply put, since the record fails to describe the tenor of the "estate planning decisions" allegedly made, it can hardly be inferred that they "were in direct contravention . . . to [the] . . . trust."

7

conversation apparently related to the disposition of her house *inter vivos*.[4] Whether they dealt with specific bequests of property to specific individuals is unknown. In other words, the evidence of estate planning about which Oliver alluded was quite oblique and hardly indicative of an effort to compel Berneta to bequeath her property as she did via the 1991 Will.

Nonetheless, one of the employees charged with assisting Berneta in the management of her financial and personal affairs (Propst) recalled a conversation with her on the subject of the 1991 Will. According to him, she called him and expressed her desire to leave her estate to Mary Miles Batson and to Batson (Berneta's daughter and grandson, respectively). Nothing was said about Propst questioning her about her comment. Nor did he say that he in anyway induced or influenced her decision. Rather, he stated that aside from relaying this information to Berneta's attorney, he did not assist in the preparation of the 1991 Will.

Moreover, when the 1991 Will was executed, it was done at the offices of the partnership. When Berneta arrived, after being told that her attorney (Pinson) would meet her at the facility, all were excluded from the room save for Berneta and her attorney. Though Pinson worked for a firm and another attorney in that firm had provided legal counseling to Batson and others in the partnership, the evidence does not indicate that anyone involved had a previous attorney / client relationship with Pinson prior to execution

---

[4]This particular discussion apparently occurred in 1992, after the 1991 Will was executed, because that is when the transaction occurred.

8

of the 1991 Will.[5]  Furthermore, after Pinson and Berneta met alone, an employee of the corporation or partnership was told to obtain individuals to witness the execution of the document. The witnesses were then garnered from those individuals present at the facility. Finally, Oliver cites us to nothing of record, nor did our review of the record uncover anything, indicating that anyone other that Berneta, Propst, and Pinson discussed the 1991 Will and its terms.  And to the extent that they were discussed with Propst , the discussion simply involved Berneta telling him how she wanted to dispose of her estate as previously mentioned.

In short, what we have before us regarding the first element in the claim of undue influence is evidence of opportunity to influence.  But, opportunity is not enough.  *Estate of Davis*, 920 S.W.2d at 466.  Nor does it permit one to rationally infer that any influence was exerted with regard to the development and execution of the 1991 Will.  At best, the record before us, when read in a light most favorable to the non-movant Oliver, depicts circumstances which are equally consistent with the absence of, or do no more than raise a mere suspicion of, undue influence.  To quote from our opinion in the *Estate of Davis*, evidence that influence was "'*in fact exerted with respect to the making of the* [1991] *testament itself*' . . .  is simply lacking here."  *Estate of Davis*, 920 S.W.2d at 466 (emphasis in original) (*quoting Rothermel v. Duncan*, 369 S.W.2d at 923).

---

[5]Batson later hired Pinson in 1995 or 1998 to draft his will.  Furthermore, Batson did not recall ever meeting Pinson prior to that time.  This is of import because Oliver stated in his brief that "the lawyers and accountants used to do Decedent's estate planning were chosen by [Batson], who is the beneficiary of the Wills."  To the extent that Berneta executed her will in September of 1991 and Batson had not met Pinson until sometime in 1995 or 1998, the utterance that Batson chose Pinson to draft his grandmother's will is quite suspect.

9

Since there exists no evidence that influence was exerted, summary judgment upon the claim of undue influence was proper. Accordingly, we dismiss those issues on the appeal wherein Oliver contends that the trial court erred in granting summary judgment because questions of fact existed regarding the testamentary capacity of Berneta. In all other things, we affirm the judgment entered below.

Brian Quinn
Justice

Do not publish.

10